

NUMBER 13-14-00433-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF S.S., A CHILD

**On appeal from the 267th District Court
of Victoria County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justices Benavides, Perkes, and Longoria
Memorandum Opinion by Justice Perkes**

Appellant C.M. (Mother) appeals the trial court's order terminating her parental rights to S.S,[1] a twenty-one month old child at the time of trial. The trial court found Mother violated two statutory termination grounds by: (1) knowingly placing or allowing S.S. to remain in conditions or surroundings that endangered S.S.'s physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(1)(D) (West, Westlaw through 2013 3d C.S.);

---

[1] We use the child's and family members' initials to protect the child's identity. TEX. R. APP. P. 9.8.

and (2) engaging in conduct or knowingly placing S.S. with a person who engaged in conduct that endangered S.S.'s physical or emotional well-being, *see id.* § 161.001(1)(E). The trial court found termination to be in S.S.'s best interest. *See id.* § 161.001(2). By two issues, Mother argues the evidence is legally and factually insufficient to show (1) she violated the termination grounds; and (2) termination is in S.S.'s best interest. We affirm.

## I. BACKGROUND

The Texas Department of Family and Protective Services (the Department) moved to terminate Mother's parental rights to S.S. due to Mother's suspected contribution or allowance of abuse to S.S.'s half-sibling Z.M. Dr. Shalon Nienow, who testified as a child-abuse expert, reviewed Z.M.'s medical history and had "significant concerns that [Z.M.] had been abused for quite some time based on the nature of his previous injuries and the lack of history for those injuries as well." Specifically, Dr. Nienow observed a pattern of Z.M. suffering suspicious head injuries and Mother providing no or inadequate explanation for them.[2] Z.M. was two or three years old when he sustained the injuries.[3]

For example, Dr. Nienow expressed suspicion regarding an incident in which Mother took Z.M. to a pediatrician for swelling on the back of Z.M.'s skull. The swelling "had been there for three days and she could not provide a history as to how that swelling occurred." A few months later, Mother again took Z.M. to a pediatrician after Z.M. "reportedly stepped off a truck and twisted his ankle . . . ." The pediatrician found two

---

[2] Both Dr. Nienow and Jessica Alex, the Department caseworker for S.S.'s case, indicated that multiple head injuries to a child with no or inadequate explanation suggests abuse.

[3] Trial testimony showed Z.M. was three in November 2012. The injuries Dr. Nienow discussed occurred from October 2011 through November 2012.

areas of swelling on the back of Z.M.'s skull, but Mother provided "no history" for the head injuries. Dr. Nienow testified that the "two areas of swelling . . . implies two separate areas of impact," which was inconsistent with Mother's "simple fall" explanation.

A few months later, Z.M. "arrived at school with bruising on his face." Z.M. told a teacher that T.S. (Father)[4] "hit him because he was bad." Mother, however, told the school that Z.M. "had been hurt outside playing but [she] didn't know how he got hurt." When the Department interviewed the family three days later, Mother changed her story, claiming she and Father were throwing a football and the football hit Z.M. in the face. Z.M. adopted this explanation, but Dr. Nienow worried he had been coached during the three-day lapse because photographs showed "what looks to be two areas of bruising," which was inconsistent with the single-impact explanation in the football story.[5]

A few months later, Z.M. was beaten nearly to death. Emergency room physician Fred Martin, who testified as an expert, described Z.M.'s injuries:

> He had a head injury. We could see a contusion to the—to the scalp and back of the head. He had injuries to both ears and around the neck. In the genital region there was a contusion there. One in the low back. Laceration of the lip and swelling of the lips. And so basically front and back and both sides were all affected.

Dr. Martin clarified that the head injury involved two injuries—one on the back and one of the side of the head. Dr. Martin said the neck bruising was consistent with a "choking type of injury." Other bruises on Z.M.'s body "appeared older" and in "unusual spots to have injuries[]"—"the genitals and the low back . . . ."

Dr. Nienow gave a more detailed record of Z.M.'s injuries:

---

[4] T.S. is not Z.M.'s biological father, but he is S.S.'s biological father.

[5] Alex also suspected the football story was untrue.

He had bruising of his scalp . . . . Significant swelling of his head. Kind of on the top and to the right. He also had linear petechiae bruising which is teeny tiny broken blood vessels kind of like pinpoint dots all on a line around the front of his neck which is consistent with strangulation injury.

He had . . . injury on one of his nipples which was concerned for like a twisting or pinching mechanism. He had some bruising on his left hip into his thigh area. That's significant because it's a relatively protected area so it's an area not normally injured in accidental play. He also had significant bruising of his lower back and sacrum, so down into his butt and they were big bruises

. . . .

He had some petechiae bruising so those pinpoint blood vessels broken on his left side of his back extending to the right side of his back.

He had multiple parallel bruises on his upper right arm as well as bruising on his right forearm. He had bruising of the right—the upper lip on the right side.

. . . .

He had significant bruising of his genitalia, the left side specifically a really big kind of semi-circular bruise that extended from the top[] . . . down the left into his groin and bruising in the groin. He had bruising of the right side of his scrotum and bruising at the base of his penis.

. . . .

He also had what we call cerebral edema which is just a real fancy name for brain swelling. So really significant brain swelling which caused half of his brain to be squished over towards the right side which is probably what was largely responsible for his inability to breath on his own and his unresponsiveness.

Dr. Nienow also testified that Z.M.'s liver was lacerated, which would have required a "significant amount of compressive force" given the liver's location behind the ribcage. Based on the injuries, Dr. Nienow was surprised Z.M. survived. Mother downplayed the injuries to court-appointed special advocate (CASA) volunteer Joy Walker, claiming the Department "was exaggerating" and that Z.M. "was going to be fine . . . ." Z.M. remained

4

in a coma for at least a week,[6] and he suffered developmental setbacks due to the injuries.[7]

As an explanation for Z.M.'s injuries, Mother said Z.M. fell in a bathtub. She repeated it to several people[8] and with varying details. She told her ex-husband that Z.M. fell in a bathtub while she was at work. She told Dr. Nienow, Officer Bradley James Hlavac of the Victoria Police Department, and Detective David Ruiz of the Victoria Police Department, that she was at home and heard Z.M. fall. She told Officer Hlavac she was in the living room, but she told Detective Ruiz she was outside the house. Mother told her cousin C.P. that she "got [Z.M.] out of the bathtub and . . . dried him off," but she told Officer Hlavac Father got Z.M. out of the bathtub.

Dr. Nienow considered Mother's story suspicious because it had Z.M. taking a bath at a time that, according to Mother, the electricity was out at the house. With no windows in the bathroom, Dr. Nienow thought it would be strange for Z.M. to take a bath in the dark and with no hot water. Dr. Nienow also distrusted Mother's explanation of events because Mother said she let Z.M. watch television after he fell, which contradicted the assertion that the electricity was out. Dr. Nienow concluded that "a simple fall out of the tub cannot adequately explain all of this child's injuries . . . ."

---

[6] Mother's ex-husband, Z.M.'s biological father, said Z.M. was in a coma for a week, but the paternal grandmother thought Z.M. was in a coma for eighteen or nineteen days.

[7] Mother's ex-husband testified Z.M. acts two years younger, has difficulty with speech therapy, and is "not there" mentally. Z.M.'s paternal grandmother said Z.M. returned to the state of a baby due to the injuries.

[8] Mother told it to Dr. Martin, her ex-husband, Department investigator Nikki Nagle, Victoria Police Officer Bradley Hlavac, Victoria Police Detective David Ruiz, Mother's cousin C.P., family friend Crystal Morales, and her mother.

Dr. Martin recalled that Mother, in giving the bathtub explanation, would not make eye contact, and Dr. Martin testified Mother was not concerned about Z.M. "to the degree that I would think she would be." Mother was more "concerned about something else besides the child." Z.M.'s paternal grandmother testified that Z.M. informed her that Father beat him in Mother's presence. While this trial was ongoing, Father pleaded guilty to aggravated assault of Z.M in a separate, criminal proceeding.

Although Father pleaded guilty to injuring Z.M., Mother was a co-defendant in that proceeding, and an assistant criminal district attorney explained that the State scheduled Mother's criminal case for later. Several witnesses described Mother as "rough" or "aggressive." Mother's cousin C.P. characterized Mother as a "rough" parent who cussed at Z.M. According to C.P., "in the household with [Grandmother] and [Mother] everybody walks on eggshells because it has to be [Mother's] way." C.P. recalled an incident in which Mother "had taken the belt to [Z.M.] because he couldn't put his shoes on the right feet." Jamie George, a friend of Grandmother, agreed with C.P., describing Mother as an "aggressive" parent. George testified that Mother screamed and cussed at Z.M. since he was a baby. George said Mother would scream at Z.M. across a room, "F— you know, you need to F— get . . . ."[9] Z.M.'s paternal grandmother remembered that while Mother was visiting Z.M. in the hospital, Z.M. asked Mother something and "she turned around and hit him . . . ." When the paternal grandmother protested, Mother said, "I'm the mother."

---

[9] Mother's verbal abuse toward her maternal grandmother prompted the Department to open an elder abuse case on Mother.

6

About one month before Z.M.'s near-fatal beating, the Department implemented a safety plan with Mother, which prohibited Father from having unsupervised contact with Z.M. and S.S. The Department initiated the safety plan in response to a drug raid at Father's parents' house, where Mother and the children stayed. Victoria Police Officer Jason Stover testified that "numerous tips" of drug transactions occurring there prompted the raid.[10] The search uncovered no drugs, but they found "several duffle bags with [marihuana] residue" and "other evidence of narcotics." Officer Stover also stated that the house smelled strongly of fresh marihuana, and he later learned "there was an area of the house that had not been searched that was kind of a secret area in the house . . . [and] had we [searched there] . . . we would have found what we were looking for." Officers arrested Father and his parents but did not arrest Mother because she had a small child—S.S. C.P. testified Mother contacted her after the drug raid and asked C.P. to "take them in." C.P. allowed Mother, Father, and the children to stay with her. She remembered thinking it odd that Father parked Mother's car in her garage and "they would get down, things like that," and C.P. later discovered that Father was a fugitive from the law while he stayed with her.

In addition to the drug raid, Officer Stover believed a drive-by shooting had occurred at the house, and he suspected Father was a gang member. Officer Stover stated that the house involved "quite a few report referenc[ing] violent type offenses occurring both at the house and in between various people . . . ." Mother's mother (Grandmother) expressed discomfort with Father and his family's "criminal" reputation.

---

[10] One tip came from occupants of a car that left the house. Police officers stopped their vehicle, and the occupants told the officers they purchased drugs at the house.

7

When Z.M. was hospitalized, the Department implemented its second safety plan, giving Grandmother care of S.S. and prohibiting Mother's unsupervised contact with S.S. Later that day, Dr. Nienow watched Grandmother hand S.S. to Mother and Mother "walk out of the hospital with the baby in the carrier and grandmother stay behind in the hospital." Dr. Nienow attempted to follow Mother, but Mother disappeared "into the parking lot area." Dr. Nienow contacted the Department, and Grandmother's violation of the safety plan resulted in the Department removing S.S. her care.[11]

The Department originally planned to reunite Mother with S.S., and it created a third safety plan. Mother completed the plan, but the Department and CASA recommended termination of Mother's parental rights because it perceived Mother deceived the Department and CASA. CASA volunteer Walker testified, "we're finding out now the lies started from the beginning." While attending mandatory counseling sessions and complying with the safety plan, Mother became pregnant with E.C. George heard Mother say that Father was E.C.'s father, and Father told the Department E.C. was his child.[12] During that time, Father was a fugitive of the law, and Mother repeatedly told Detective Ruiz that she did not know where Father was, and she denied seeing Father to Jessica Alex, a Department caseworker. Mother's counselor, Wendy Holder, said Mother lied to her about seeing Father and being pregnant. Mother also denied being pregnant to Alex and Walker. According to Walker, Mother attempted to conceal E.C. even after he was born, evading Walker's questions. When Walker bluntly asked about the baby,

---

[11] Grandmother intervened in the case below, but she did not bring her own appeal from the court's judgment.

[12] Mother told others her ex-husband was E.C.'s father. Mother's ex-husband in his testimony denied fathering E.C. or being intimate with Mother at the relevant time.

Mother said "she went to the hospital with a tummy ache and came home with a baby." George, as well as Cyrstal Morales, Mother's friend, affirmed Mother knew about E.C. before delivering E.C. Walker asked Mother how she could protect Father after the abuse he inflicted on Z.M.,[13] and Mother responded, "I love him."

Although Mother completed a drug and alcohol assessment, Alex testified Mother refused a hair follicle test because it would, according to Mother, reflect she was not clean. George confirmed that Mother had a history of smoking marihuana. Based on the Department's concern that Mother used drugs and disregarded Holder's recommendations by reuniting with Father,[14] Alex testified that although Mother completed her safety plan, "there is a concern that the plan of service was merely used as a checklist and that weren't patterns of behavior that were changed." Upon discovering Mother's alleged misinformation and re-reviewing Dr. Nienow's report, Alex concluded:

> Looking back at all the injuries that [Z.M.] sustained through the investigations . . . and everything that is reported in the file, there's a concern that [Z.M.] was sustaining injuries on a consistent basis and there's also a concern that [Mother] was not protective. There's concern that she knew that was occurring and that there is risk to [S.S.] due to that.

After the Department closed, Mother called Holder as a witness. Holder "primarily worked [with Mother] on identifying red flags in relationships" and avoiding unsafe people. In Holder's assessment, Mother appeared responsible, had a stable job, was a stable person, and "one the biggest things—she demonstrated that she had a very good support system for herself." Holder did not believe Mother attended counseling to satisfy a safety

---

[13] Walker clarified that it was assumed at that time that Father was solely responsible for the abuse.

[14] Alex testified, "One of the problem areas addressed in the psychological evaluation was that [Mother] has a history of developing inappropriate relationships and returning to inappropriate relationships even when under supervision . . . ." Holder confirmed that a primary theme of her counseling sessions with Mother was to recognize unsafe relationships and proper boundaries. C.P. testified Mother has a history of dating violent men.

plan; Holder felt Mother sought personal improvement, and Holder released Mother from counseling because she "met all of her goals in counseling that the Department had brought up as issues . . . ."

When defining a person's development of a support system, Holder explained, "It takes reaching out to others, you know. She was able to work very hard to reestablish relationships and fix relationships within her family that had previously been strained." When the trial court asked Holder how she knew that Mother reestablished those relationships, Holder acknowledged her assessment depended on what Mother told her in the counseling sessions; Holder did not verify Mother's assertions. When asked on cross-examination how Holder knew Mother was honest, Holder responded that the "things that [Mother] and I discussed in session wasn't necessarily facts. . . . There's a difference between feelings and facts." Holder agreed Mother lied to her about seeing Father and being pregnant.

Elizabeth Flores testified for Mother, stating that Mother attends church and strives to improve herself. Morales stated she sees Mother five to six times a year and talks to her on the phone several times a month, and in her estimation, Mother is responsible, has a good job, and does not discipline her children inappropriately.

The attorney ad litem called Mother to testify, but Mother elected to not testify on Z.M.'s injuries pursuant to the Fifth Amendment. The trial court admonished Mother, "[U]nlike a criminal case, this is a civil case and I am allowed to draw certain inferences from your failure to testify." Mother affirmed her preference against testifying to the facts related to her criminal indictment, and she then provided limited testimony on her job,

10

counseling goals, and relationship history.  After all sides closed, the trial court invited the attorneys to present cases on whether the trial court could:

> draw inferences that [Mother] in fact did participate in the child's injuries, that she in fact did continue to have [S.S.] in the presence of the child's father, and . . . that she tried to conceal through her silence her knowledge that the injuries to her older child were . . . caused by [Father].

The court also asked whether the inference would extend to concluding that Mother participated in inflicting the injuries.

## II. STANDARD OF REVIEW

To terminate parental rights, a trial court must find by clear and convincing evidence that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001(1)–(2) (West, Westlaw through 2013 3d C.S.); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2013 3d C.S.); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

In reviewing the legal sufficiency of the evidence supporting termination of parental rights, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *In re J.L.*, 163 S.W.3d at 85.  We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could have done so, and we disregard all evidence that a reasonable fact finder could have disbelieved.  *Id.*  However, we must also consider undisputed evidence, if any, that does not support the finding.  *Id.* at 86.

11

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings and not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(2); *In re C.H.*, 89 S.W.3d at 26. We defer to the trial court as the exclusive judge of credibility of the witnesses and the weight to be given their testimony. *See, e.g., Burns v. Burns*, 434 S.W.3d 223, 227 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The evidence is factually insufficient if the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding. *In re H.R.M.*, 209 S.W.3d at 108.

### III. STATUTORY FACTORS

By her first issue, Mother challenges the factual and legal sufficiency of the evidence to support the trial court's finding that Mother either (1) knowingly placed or allowed S.S. to remain in conditions or surroundings that endangered S.S.'s physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(1)(D); or (2) engaged in conduct or knowingly placed S.S. with a person who engaged in conduct that endangered S.S.'s physical or emotional well-being, *see id.* § 161.001(1)(E). "'Endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "[I]t is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Proof of one violation under section 161.001(1) is sufficient to satisfy the first prong of the analysis. *See In re J.L.*, 161 S.W.3d at 847

12

(holding proof of "one of the acts" is sufficient); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002) ("any one . . . may satisfy the first prerequisite for termination). The trial court was permitted to draw negative inferences from Mother's election to not testify pursuant to her Fifth Amendment right, *see* U.S. CONST. amend. V, against self-incrimination in a criminal proceeding. *See In re C.J.F.*, 134 S.W.3d 343, 354–55 (Tex. App.—Amarillo 2003, pet. denied) ("Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances."); *see also Carpenter v. Tex. Dep't of Family & Protective Servs.*, No. 03-06-00239-CV, 2008 WL 5423223, at *10 (Tex. App.—Austin Dec. 31, 2008, no pet.) (mem. op.).

From Dr. Nienow's testimony of Z.M.'s recurring head injuries, coupled with Mother's dubious or nonexistent explanations, the trial court could form a firm conviction or belief Mother knew of, if not contributed to, Z.M.'s ongoing abuse. The trial court could conclude that Mother's explanations, including her unbelievable account that Z.M. lacerated his liver and lips and sustained bruises all over his body by falling in a bathtub, reflected her attempt to protect herself or T.S. at the expense of her children. The trial court also could reasonably conclude Mother lied to hide the injuries inflicted on Z.M., thereby preventing his escape from subsequent abuse.

In addition, although police raided a home that Officer Stover characterized as having a history of violence, drug transactions, and gang activity, Mother kept her children there. C.P. testified Mother smoked marihuana, and Alex said Mother refused a hair follicle test, which the trial court could interpret to mean that Mother used drugs, *see, e.g., In re J.T.G.*, 121 S.W.3d 117, 131 (Tex. App.—Fort Worth 2003, no pet.) (holding fact

13

finder can infer parent used drugs from the parent's refusal to complete a drug screen). C.P. testified Mother protected Father as a fugitive after the raid, and Mother's bathtub account, if true, shows she disregarded the Department's safety plan by allowing Father unsupervised contact with the children.

We conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother engaged in conduct or placed or allowed S.S. to remain in conditions, surroundings, or with persons that endangered S.S.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *Boyd*, 727 S.W.2d at 533 (holding endangerment can be proven through conduct not directed at the child but that threatens child's physical and emotional well-being). We overrule Mother's first issue.

## IV. BEST INTEREST

By her second issue, Mother argues the evidence is legally and factually insufficient to support that termination is in S.S.'s best interest.

## A. Applicable Law

Evidence proving one of the prohibited acts or omissions under section 161.001(1) may also be probative to the best-interest determination. *In re C.H.*, 89 S.W.3d at 28. A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of evidence. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.); *see In re S.H.A.*, 728 S.W.2d 73, 86–87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *see also In re A.M.*, No. 13-12-00767-CV, 2013 WL 1932903, at *25 (Tex. App.—Corpus Christi May 9, 2013, no pet.) (mem. op.). There is a strong presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b) (West, Westlaw through 2013 3d C.S.); *In re R.R.*, 209

14

S.W.3d 112, 116 (Tex. 2006) (per curiam). When determining if termination is in the child's best interest, the following list of factors should be considered:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. In some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *Id.* The fact finder can assess a child's best-interest based on the parent's acts or omissions with other children. *See, e.g., In re Baby Boy R.*, 191 S.W.3d 916, 926 (Tex. App.—Dallas 2006, pet. denied) (weighing parent's sexual assault of another child in determining best interest). The trial court was permitted to infer from Mother's decision to not testify that she knew the details of Z.M.'s injuries or contributed to them. *See In re C.J.F.*, 134 S.W.3d at 354–55; *see also Carpenter*, 2008 WL 5423223, at *10.

When the Department is the petitioner, section 263.307(b) of the Texas Family Code lists thirteen factors that the court should consider in determining whether a parent is "willing and able to provide the child with a safe environment." *See* TEX. FAM. CODE ANN. § 263.307(b) (West, Westlaw through 2013 3d C.S.). We give consideration to these factors to the extent applicable. *See In re R.R.*, 209 S.W.3d at 116; *In re J.J.C.*, 302 S.W.3d 436, 447–48 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also In re R.S.*, No. 13-09-00368-CV, 2010 WL 877567, at *2 (Tex. App.—Corpus Christi Mar. 10, 2010, no pet.) (mem. op.).

## B.    Discussion

### (1)    S.S.'s Desires

Although S.S. was too young to voice desires, there is some case law that allows evidence of the child's bond with the parent to determine this factor. *See In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.); *see also In re R.E.S. III*, No. 13-10-00132-CV, 2011 WL 2475926, at *3 (Tex. App.—Corpus Christi June 23, 2011, no pet.) (mem. op.). Alex affirmed S.S. bonded with Mother and was excited to see her, and when Mother's attorney asked Walker whether S.S. developed a loving and trusting relationship with Mother, Walker replied, "That would appear to be, yes." This factor weighs against termination.

### (2)    S.S.'s current and future emotional and physical needs; the current and future emotional and physical dangers to S.S.; TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7), (8), (10), (11)

As this Court has noted, "In parental termination and child custody cases it is well-settled that evidence that a parent has engaged in abusive or neglectful conduct in the past permits an inference that the parent will continue this behavior in the future."

16

*Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi 2008, no pet.) (quotation omitted). Oftentimes, "past is prologue," and there is a "great likelihood" that a parent's conduct will "continue into the future. Actions speak louder than words." *In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.); *see In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio, no pet.) (holding fact finder can measure parent's future conduct by past conduct); *In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied) (same); *see also In re J.K.K.B.*, No. 13-13-00309-CV, 2013 WL 5970419, at *5–6 (Tex. App.—Corpus Christi Oct. 31, 2013, no pet.) (mem. op.) (same).

Evidence of Mother's drug use, exposure of the children to drugs, contribution or concealment of physical abuse, disregard of prior safety plans, concealment of harboring a fugitive, and lies to the police, CASA, doctors and teachers, the Department, and her counselor undermines her ability to provide a safe environment conducive to S.S.'s present and future emotional and physical needs. *See, e.g., In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child."); *see also* TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7), (8), (10), (11). Dr. Nienow's expert testimony showed a pattern of physical abuse accompanied by Mother hiding the resultant injuries to protect herself or Father. Even assuming only Father caused Z.M.'s injuries, Mother lied to protect Father and reunited with him, despite telling the police, CASA, the Department, and her counselor that she did not know where he was. *See id.* § 263.307(b)(10) (weighing

parent's cooperation with agency's supervision in the safe-environment factors). These factors weigh in favor of termination.

**(3)     Mother's parental abilities; TEX. FAM. CODE ANN. § 263.307(b)(12)**

Testimony of Mother screaming curse words at a two or three year old and physically disciplining a two or three year old for failing to put his shoes on the correct feet reflects poorly on Mother's parental abilities. Evidence that Mother abused or allowed Father to abuse a two year or three year old weighs against her as a parent. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (weighing parent's parental ability to provide safe environment), (E) (weighing whether parent can protect child "from repeated exposure to violence even though the violence may not be directed at the child."). Evidence that Mother consistently lied to protect herself or Father at the expense of her children's safety, misinformed doctors and teachers on the causes of Z.M.'s recurring injuries, and exposed her children to illegal drugs certainly call into question her parental abilities. These factors weighs in favor of termination.

**(4)     Available programs for the promotion of S.S.'s best interest**

There was no evidence regarding the programs available to promote S.S.'s best interest.

**(5)     Plans for S.S. by Mother and the Department**

Alex testified, "The Department has located a relative and there is a positive home study." C.P. was the relative, and she testified that even Mother and Elena had approached her to consider it. But when Grandmother was asked why C.P. testified so negatively about Mother—stating Mother smoked marihuana, was aggressive toward and screamed curse words at Z.M., and reunited with Father while he was a fugitive—

18

Grandmother responded that C.P. is "vindictive," has a history of drugs, and "has problems." C.P. was not the only Department witness whose credibility Grandmother challenged; Grandmother said Dr. Nienow misrepresented the facts, and she said her friend George testified negatively because George "is upset with me because I called her out on her personal life because I just told her I didn't think she was living right." On the other hand, George testified that Grandmother discouraged her from testifying truthfully against Mother: "[S]he was asking me, telling me that if I told the truth it was going to get [Mother] in trouble." We defer to the trial court's resolution of the weight and credibility of the witnesses. *See Burns*, 434 S.W.3d at 227.

Mother works full-time, and the evidence showed she was not in a relationship with anyone at the time of trial. Flores, Mother's friend from church, said she would watch S.S. because Grandmother also works full-time during the school year. The record provides few details on Flores, except that she attends the church that Mother joined while working on her third safety plan. Allowing the trial court its role in weighing the witnesses credibility, *see Burns*, 434 S.W.3d at 227, this factor weighs in favor of termination.

### (6)  Stability of the home and the proposed placement;

Holder's testimony presented Mother as stable and responsible. *See* Tex. Fam. Code Ann. § 263.307(b)(6) (including psychological evaluations of parent in safe-environment factors). It is apparent from Holder's testimony that she premised this assessment on the assumption Mother had developed a good support system: "one the biggest things—she demonstrated that she had a very good support system for herself." *See id.* § 263.307(b)(13) (factoring presence of adequate support system). When asked

19

what developing a support system required, Holder said it involved reestablishing strained relationships. Holder believed Mother had established positive relationships, but Holder acknowledged that conclusion relied on Mother's self-reporting; Holder did not verify Mother's assertions, noting that her focus with Mother "wasn't necessarily facts." Holder acknowledged Mother lied to her regarding her contact with Father and her pregnancy.

According to Holder's testimony, the primary goal of her sessions with Mother was to identify and avoid unsafe relationships. While Holder believed Mother progressed in that endeavor, Mother secretly reunited with Father and lied to Holder about it. *See id.* § 263.307(b)(10) (factoring parent's cooperation with supervision and counseling), (11) (factoring parent's ability to effect environmental and personal changes). Moreover, as Holder recognized when answering the trial court's questions, she presumed Mother did not contribute to Z.M.'s injuries. Teaching Mother to identify and avoid unsafe people presumes Mother did not contribute to Z.M.'s injuries or was aware of Father abusing Z.M. The trial court, which alone weighs credibility, *see Burns*, 434 S.W.3d at 227, could have concluded Mother was not a naïve bystander needing training on how to better identify dangerous relationships; the trial court could have reasonably concluded that Mother caused or knew of ongoing abuse to Z.M. Regardless, exposure to drugs, drugs use, criminals, physical abuse, and verbal abuse undermines the stability of a home. *See, e.g., In re A.C.,* 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(7) (factoring "history of abusive or assaultive conduct" by family members), (8) (factoring "history of substance of abuse" by family members). This factor weighs in favor of termination.

**(7)** **Mother's acts or omissions that indicate that the existing parent-child relationship is not a proper one; Mother's excuses for the acts or omissions**

Subjecting children to verbal and physical abuse and exposing them to drugs and criminals indicate the parent-child relationship is not a proper one. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7), (8), (10), (11), (12). Mother never excused her acts or omissions. She never took responsibility for them; she maintained to friends, family members, the police, and doctors that Z.M. sustained injuries to his entire body by falling in the bathtub. When Walker asked Mother how she could protect Father after he presumably abused Z.M., Mother responded, "I love him." Although Mother ultimately completed a safety plan, she directly violated the first one and indirectly violated another. *See* TEX. FAM. CODE ANN. § 263.307(b)(4) (including evaluation of whether child has been a victim of repeated harm after an initial intervention by Department). Mother's propensity to prioritize her or Father's interests over her children's and evidence of her verbal and physical abuse make this factor weigh in favor of termination.

Given the gravity and weight of the evidence of Mother's contribution to or disregard for the repeated physical abuses on Z.M., protection of Father rather than her children, non-compliance with the Department's and her counselor's recommendations, and lying, in this case these two factors alone are legally and factually sufficient to support the trial court's best-interest judgment. *See In re C.H.*, 89 S.W.3d at 27 (holding that undisputed evidence of just one factor can be sufficient to support a finding that termination is in the best interest of the child).

**C. Summary**

After reviewing all the evidence under the *Holley* and statutory factors, we hold the evidence is legally and factually sufficient to support the trial court's best-interest judgment. We overrule Mother's second issue.

## V. Conclusion

We affirm the trial court's judgment.

_____
GREGORY T. PERKES,
Justice

Dissenting Memorandum Opinion
by Justice Gina M. Benavides

Delivered and filed the
15th day of January, 2015.